May it please the Court, I'm Lisa Chandra, representing Appellant Eustorgio Flores. I would like to reserve two minutes for rebuttal. This morning I hope to discuss first the standard of review for the sufficiency of the evidence claims, and then why the evidence is not sufficient for Count 4, attempted distribution of methamphetamine near an elementary school, and Count 5, distribution of methamphetamine near an elementary school. I understand that the government concedes that de novo is the appropriate standard. I see a nodding head from the government side. Why did you want to argue that? Mostly just to clarify what the applicable standard is, because there appears to be some – De novo is better for your client. Oh, absolutely. I agree. And the government concedes de novo. Why snatch defeat from the jaws of victory on that point? I am happy to have it reviewed de novo, Your Honor. Okay, I'll proceed then to Count 4. Attempted distribution of methamphetamine. The government's evidence was not sufficient to show the required amount of methamphetamine to trigger the statutory minimum sentence. And I would like to mention that in the opening brief, I erroneously referred to a statutory mandatory minimum sentence as a sentencing enhancement, and I apologize for that error. To trigger the statutory mandatory minimum, the government needed to show at least 50 grams or more of methamphetamine, or 500 grams or more of a mixture of a substance containing methamphetamine. Here, the government alleged that Mr. Flores negotiated in July 2007 with a confidential source and undercover DEA agent Todd Keyline to sell one pound of methamphetamine. But the government failed to show the required minimum amount for three reasons. First, agent Keyline never saw any methamphetamine in July 2007, and he testified as much at trial. Because he didn't see any, he couldn't make a visual estimate of the drug quantity. Second, no drug evidence was purchased or seized at that time, so there's no drug weight or lab analysis. And finally, the evidence supporting the alleged one pound of methamphetamine was purely speculative. Although the confidential source and agent Keyline did testify at trial, the government did not ask what the specific amount negotiated for in July 2007 was. Instead, they asked two other DEA agents who were not directly involved in the negotiations to speculate what the amount of methamphetamine actually was. Those agents, Borowski and Wong, testified that the number 17 by itself in the wiretap transcripts referred to $17,000, which they said was the going rate for one pound of methamphetamine at the time in California. But elsewhere in the transcripts, they refer to the number 15 alone, which testimony said referred to $1,500. So because the testimony regarding the significance of the numbers was inconsistent, it's merely speculative. But isn't that for the jury to reconcile and to decide? Didn't they do that? Isn't our responsibility to give a lot of deference to the jury in this case? It is, Your Honor, and I'm merely arguing that this is why the evidence was not sufficient. Your point is that there's nothing in these conversations that specifically says or refers to amount. Correct. There's nothing. They just refer to one, but there's no indication that it's one pound other than the speculative testimony, which is the word 17 by itself, according to the agents who testified. And even though they had the opportunity to directly ask both the confidential source and the agent who were involved in the alleged negotiations, they never asked what one referred to. And neither testified. I think that your point also is that if we're to accept the government expert's version of what all of these words meant in these wiretaps or tape-recorded conversations, then we have to accept it for this purpose also. I'm sorry, I'm not sure I understand your question. Well, you're referring to the reference to 15 and 17. The reason we know that that referred to dollar amounts is because of the testimony of the agents, correct? Correct, Your Honor. And if we have to accept it for sufficiency purposes, then we have to accept it for these purposes, I take it. For these purposes. I'm trying to help you here. No, no, I know you are, so I'll answer yes. Okay. So in conclusion, on Count 4, we ask that it be remanded for resentencing because fairness requires that he not be sentenced for something that was not proved. Regarding Count 5, distribution of methamphetamine near an elementary school, the government's evidence was not sufficient to show beyond a reasonable doubt that the conduct was not innocent. This Court said that when there's an innocent explanation for a defendant's conduct, as well as one that suggests that the defendant was engaged in wrongdoing, the government must produce evidence that would allow a rational jury to conclude beyond a reasonable doubt that the latter explanation is the correct one. What's the innocent explanation? Here the innocent explanation is that instead of distributing drugs to Pablo Serrano in the Flores home, Mr. Flores had directed his wife and co-defendant, Hortensia Flores, to give Mr. Serrano a pocket-sized scale. What supports that is three different things. First, that there's no evidence that there was any methamphetamine. What was this pocket-sized scale for? There's no evidence suggesting what the pocket-sized scale was for, but it was found in Mr. Serrano's possession in his pocket when he was stopped at the traffic stop after he had left the Flores residence. You think it would be improper for the jury to assume that that scale was for the purpose of distributing controlled substances? I don't know, Your Honor. I would just say that there's nothing on the record to show that it was given to Mr. Serrano for that purpose, and the record simply shows that it's equally likely that they gave him the scale, as that he could have retrieved methamphetamine from that home. It was on him, and then after he was... So you're saying it was a scale instead of methamphetamine? Correct. It shows it was equally likely that it was either the scale or methamphetamine. But isn't there some discussion between Mr. Flores and Mr. Serrano talking about splitting it in half? And so doesn't that seem sort of illogical to draw that reference that a pocket scale could be split in half, and doesn't that defeat your argument that it's... I don't believe it does, Your Honor, because my argument is that the evidence shows it's equally likely that it's the methamphetamine or the scale. It doesn't really prove one way or the other which that it was. Because after he was picked up at the traffic stop, Mr. and Mrs. Flores, there was a recorded conversation in which they were very upset about the fact that he was picked up with the scale, and they clearly had an interest in the scale. And when they referred to it, he asked him to get it from the Levi's jacket pocket, and the scale was found in Mr. Serrano's pocket, so it could have been what was in the pocket. Additionally, there's no evidence that Mr. Serrano did not already have that methamphetamine on him when he entered the Flores home. There's no evidence that there wasn't already methamphetamine in the home, and again, it could refer to anything. So, considering all of this, we ask that Count 5 be reversed for insufficient evidence because the government failed to prove beyond a reasonable doubt that the conduct was not innocent. Can I ask just one technical question? Your client was convicted of how many counts? Four counts, Your Honor. And he's appealing just to? Just the two, yes. Number 2 and number 5? Number 4 and number 5. Number 4 and number 5. He was also convicted of count 1 and count 6. Okay. Thank you. Thank you, Your Honors. Good morning, Your Honors. My name is Karen Escobar. I represent the United States. I handled the trial in this matter. I'd just first like to point out that there is no Jennifer Lynn Thurman. The defense in her reply captioned at page 1 the defendant's name as being Jennifer Lynn Thurman. I think it refers to a prior case. In any event, the district court was correct in finding that the evidence with respect to all counts was overwhelming. This is the district court Judge Wanger, formerly a senior judge in Fresno, found that the evidence was sufficient when the judge did consider the defendant's post-trial motions, stating that he didn't have jurisdiction to hear the case again, but there was sufficient evidence. With respect to the attempted distribution of methamphetamine, defense counsel would take isolated words out of context in arguing there is insufficient evidence. The agents who testified, the undercover agent, Agent Keyline, the controlling agent of the confidential source in Hawaii, Agent Borosky, both testified to the meaning of 1 in the context of the attempted distribution of methamphetamine. There was also recorded conversation of the confidential source in Hawaii, who was acting under the direction and in the presence of Agent Borosky when he initially set up the deal and introduced Agent Keyline to the defendant for the purpose of obtaining a pound. And the confidential source was somewhat apologetic when he said, referring to just one pound. In the context of their relationship, he had been dealing in multi-pound quantities. He testified that he'd never obtained less than three pounds of methamphetamine from Mustorio Flores, or three kilograms of cocaine. Typically, their relationship was based upon five and five was the language and code words that the confidential source referred to in the context of their drug dealing relationship. Five pounds of methamphetamine, five kilograms of cocaine. Ultimately, the deal that occurred after the undercover agent attempted to obtain the pound was for five and five. This was the deal in the spring of 2008 where the confidential source tried to obtain five pounds of methamphetamine and did obtain, ultimately, 4.5, four and a half pounds of net weight crystal methamphetamine from following negotiations with Mustorio Flores. The defendant argues that 17 could just mean 1,700. However, in the context of the negotiation for just one, referring to one pound, the agents both testified that 17,000 was consistent with the price at that time of one pound of crystal methamphetamine. And it all makes sense when, ultimately, Mustorio Flores himself says the price goes up by $1,500. Agent Keyline, in the recorded conversation, says 15, referring to the $1,500 bump, which the defense seizes upon to argue perhaps 17 refers to 1,700. The defendant and confidential source never refer in that terminology to prices. 15 is always consistent with $15,000. The confidential source did, in fact, testify that 15 in the context of another deal referred to $15,000 for the price of a kilogram of cocaine. In any event, when the price goes up by $1,500, Mustorio Flores specifies in the recorded conversation, and this is in the defendant's excerpts of record at 197, 18, 500 referring to the price for the pound, which was consistent with a price range of a pound of methamphetamine at that time, 18,500. So in the context of the recorded conversations, based on the prior dealings between the confidential source and Mustorio Flores, 17 refers to $17,000, the price of a pound, and so does 18, 500. These are the words of Mustorio Flores, refers to the increased price by $1,500 of $18,500. The government also presented evidence with respect to what a pound would have meant in terms of gram quantities in order to establish the drug quantity for the charge of attempted distribution of 50 grams or more of actual. The chemist testified with respect to the drug seized from the confidential source's residence in Maui that was 18 pounds of cocaine and about 6 pounds of crystal methamphetamine. The methamphetamine that was analyzed was 100% pure, and that was the Maui. The drugs obtained from Flores and co-defendant Santa Cruz, that was the testimony of the confidential source. Now, the drugs that were then later seized in August, the transaction that ended the case during the takedown of this case, the 4.5 pounds that were seized following negotiation with Mustorio Flores by the confidential source, the average purity of that drug was 97%. So if we take the lower of the 100% purity and the 97%, applying that to 454 grams, which is equal to 1 pound, you get 440 grams of actual, way in excess of the statutory threshold amount of 50 grams of actual methamphetamine. So the jury was entitled to infer that the negotiations were for 50 grams or more of actual based upon the nature of the dealings between the confidential source and Mustorio Flores historically. The confidential source also did testify in this case, although not specifically with respect to what 1 pound meant. He did testify. The defense could have questioned him more specifically about the terminology used during the attempted negotiations by the undercover agent, Agent Keyline, posing as the truck driver. Now, with respect to the distribution of methamphetamine near an elementary school, the circumstantial evidence is very strong, as Your Honor points out. Well, let me ask you about that. What was Mr. Serrano's relationship to Mr. Flores? He was a customer, and that was established during the recorded conversation. Actually, this was during the wiretaps. These were wire intercepts, and Serrano calls Mustorio Flores on his phone, says, how much will you let me have one? One of those that I always get. Establishing a preexisting relationship, and the call indicates that that relationship is one of drug dealing. He is the buyer. Why isn't it reasonable to infer that he had the drugs with him all along when he went into the house? Because the recorded conversations make it clear that the discussion was not about obtaining a scale. The discussion is about when Serrano asks about he needs one, one of those that he always gets, first of all, that does not refer to a scale. It would be reasonable to assume he's referring to a drug, not a scale that he always gets. Flores says about two. That would indicate a drug. It does not sound, it wouldn't be reasonable to assume they're talking about a scale. And it goes on. It's clean. It's not messed up, Flores states. There would be no discussion about the purity of a scale. The agents testified, it's clean, it's not messed up, referred to the purity. And in fact, as the evidence established at trial, the drugs were very pure in this case. The methamphetamine that was seized and tested. So it's clean, it's not messed up, has no relationship to a scale. And then Serrano says he ran into this dude here in Hanford, which is near Fresno, slightly southwest, I guess, and he wants half. It would not be reasonable to assume that we're talking about a scale. He wants half a scale. And then after this call, it appears during the call that Flores is not home. He says he's going to ask his wife. And he then calls his wife and says that Chilango, Chilango is a nickname for someone from Deafe, the Mexico City. There was testimony regarding that. His license indicated he was from, or his identification card seized from Serrano indicated he was from Mexico City. Again, there's a nickname consistent with a preexisting relationship. Flores tells his wife, Chilango's on his way over. Then there's surveillance at his house, the house near the school. And in fact, Pablo goes there, enters the house. He's not there long. He exits. There's a traffic stop. And in fact, he's in possession of two packages of methamphetamine and a scale. The two packages would be consistent with Hortensia, the wife, later then telling Serrano, her husband, Serrano's been stopped and he split it in two is what she says during the intercepted call. And that is consistent with the Hanford dude wanting half. And then it goes on beyond that. Hortensia talked to the wife or the mother of Chilango later. She related to Flores that Chilango's mother was very, very upset. And then Hortensia tells Flores, it's a bitch for real. We'll see if the fucking old lady doesn't tell the cops on us. Now I'm worried about that. The jury was entitled to infer based upon that language that this drug deal was not about, or this deal was not for the purpose of obtaining a scale. They're both worried that Serrano might talk, and that's why they also talk about getting his bail. And there was testimony from the agents that it is typical for drug dealers, especially leaders, to put up bail money so people don't talk. There was also, and this was not highlighted in the government's brief, there was 404B evidence presented. It was the conduct that served as the basis for the predicate for the 851 enhancing information. That is a prior methamphetamine conviction. A detective from Tulare testified, Detective Haney. This was at the reporter's transcript 844 to 854 about undercover purchases from Flores. And ultimately the local agents got a search warrant for the defendant's residence in connection with that case. And the search warrant was for the same residence as the residence in this case, the residence across from the school at 908 South T Street in Tulare. And at that residence, the case agent, the Detective Haney, found scales that were, and he testified, commonly used by drug traffickers for the purpose of distribution. He also found $600 in cash, consistent with proceeds of drug sales, and the defendant had two 8-balls of methamphetamine on his person. From that 404B evidence, the jury was entitled to draw all reasonable inferences and find that the defendant had, in fact, distributed methamphetamine to Chilongo in connection with the conduct alleged, or that gave rise to Count 5. The government would ask this court to affirm the defendant's convictions with respect to Count 4 and 5. Viewing the evidence in light most favorable to the government, there was ample evidence to convict on both counts. Thank you. Thank you. Ms. Sandra. I would like to address one point that the government made, which she said that the phrase, it's clean, not messed up, would not be in reference to scale. But I want to point out that when Mr. Serrano was stopped, there were actually two scales in his possession. One, the small pocket-sized scale, and second, there was a larger full-sized scale in the trunk that, according to the evidence, was very dirty and possibly contaminated. And so there was, in fact, a clean scale and a messed up scale, so that comment could have been in reference to a scale. Unless the court has further questions, I'll submit. I don't. Judge Fletcher, do you have any other questions? I don't have any other questions. Thank you. Thank you. Thank you, Your Honors.
judges: Fletcher, Hawkins, Murguia